**Beverly A. WOODWARD et al.,
Plaintiffs,**

v.

**William P. ROGERS et al.,
Defendants.**

**Civ. A. No. 42–72.**

United States District Court,
District of Columbia.

June 26, 1972.

J. Roderick Heller, III, Charles E. Hill, A. Douglas Melamed, Wilmer, Cutler & Pickering, Washington, D. C., for plaintiffs.

Robert C. Mardian, Asst. Atty. Gen., Benjamin C. Flannagan, Garvin L. Oliver, Department of Justice, Washington, D. C., for defendants.

FLANNERY, District Judge.

The plaintiffs herein seek on their own behalf and on behalf of all United States citizens who will apply or have applied for a United States passport and who will be or have been required to swear to or affirm the contents of an Oath of Allegiance as a prerequisite to the issuance of a passport, (1) a declaratory judgment that the required Oath of Allegiance is unauthorized by and contrary to law, and the United States Constitution and (2) injunctive and other appropriate relief preventing the defendants, the Secretary of State and the Director of the Passport Office of the Department of State, from conditioning the issuance of a passport upon the swearing or affirming of the contents of such an Oath of Allegiance.

For the reasons hereinafter stated the Court finds the requirement that the aforesaid Oath of Allegiance or its substantial equivalent be executed as a prerequisite to the issuance of a United States passport to be unlawful and violative of rights guaranteed by the Due Process Clause of the Fifth Amendment to the Constitution of the United States.

Late in 1971, plaintiff Allan Fletcher mailed an executed application form to the Passport Office of the United States Department of State. Fletcher refused to swear to or affirm the Oath of Allegiance required by the Secretary of State as a prerequisite to the issuance of a United States passport and, consequently, the Secretary refused to issue a passport to him.[1]

1. The defendant, Secretary of State, and the co-defendant, the Director of the Passport Office, also refused to issue a passport to another plaintiff, Beverly A. Woodward, on the same ground. On April 28, 1972, this court, in response to a motion for a preliminary injunction filed on behalf of plaintiff Fletcher, and after an accelerated schedule of briefing and argument, ordered the defendants to issue a passport to Fletcher pending a final decision in this cause.

In reaching that decision, the Court found that the refusal to issue a United States passport to Fletcher, a United States citizen whose passport application was properly executed but for his rejection of the Oath of Allegiance requirement, would have a potentially irreparable and imminent adverse impact on his livelihood. The Court further concluded that the plaintiff's challenge to the mandatory Oath requirement had a substantial likelihood of ultimately be-

The required Oath provided:

Further. I do solemnly swear (or affirm) that I will support and defend the Constitution of the United States against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same; and that I take this obligation freely, without any mental reservations, or purpose of evasion: So help me God.[2]

## JURISDICTION

It is plain and uncontested that this Court has jurisdiction over this action arising under the First and Fifth Amendments to the United States Constitution and Section 213 of Title 22 of the United States Code. It involves a

substantial challenge based on fundamental constitutionally guaranteed rights, and the amount in controversy exceeds the requisite jurisdictional sum.[3]

### Whether A Three-Judge Court Is Required

Although neither party has asked that a three-judge court be convened to hear this suit pursuant to the provisions of 28 U.S.C. § 2282,[4] and, indeed, both parties have urged the Court to rule on the merits, the Court has no jurisdiction to proceed to the merits if the statute requires formation of this special tribunal. In weighing the necessity to convene a three-judge court, this Court must first decide whether the complainant attacks the constitutionality

---

ing sustained and that neither the defendants nor the public interest would incur serious injury by the granting of a passport to this individual plaintiff. The preliminary injunction having been granted, this case is presently before the Court on cross motions for summary judgment.

2. In addition to refusing to take the above-quoted Oath, plaintiffs Fletcher and Woodward have also refused to subscribe to a number of alternative Oaths which State Department regulations permit an applicant to swear to in lieu of the Oath stated above. The permissible alternatives are set forth in defendants' Handbook on Passports, distributed to its employees, but that Handbook in Section 450.6 specifically states that the applicant's alternative version may not be one which "change[s] the nature and substance" of the Oath.

3. See, e. g., 28 U.S.C. §§ 1331, 2201–02; Aptheker v. Secretary of State, 378 U.S. 500, 505, 84 S.Ct. 1659, 12 L.Ed. 2d 992 (1964); Kent v. Dulles, 357 U.S. 116, 125, 126, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958).

"Freedom of movement across frontiers in either direction, and inside frontiers as well, was a part of our heritage. Travel abroad, like travel within the country, may be necessary for a livelihood. It may be as close to the heart of the individual as the choice of what he eats, or wears, or reads. Freedom of movement is basic in our scheme of values." Kent v. Dulles, supra at 126, 78 S.Ct. at 1118.

4. 28 U.S.C. § 2282 provides: "An interlocutory or permanent injunction restraining the enforcement, operation or execution of any Act of Congress for repugnance to the Constitution of the United States shall not be granted by any district court or judge unless the application therefor is heard and determined by a district court of three judges under section 2284 of this title."

The Supreme Court in Mitchell v. Donovan, 398 U.S. 427, 431, 90 S.Ct. 1763, 1765, 26 L.Ed.2d 378 (1970) (per curiam) stressed "that the three-judge-court legislation is not 'a measure of social policy to be construed with great liberality,' but is rather 'an enactment technical in the strict sense of the term and to be applied as such.' Phillips v. United States, 312 U.S. 246, 251 [61 S.Ct. 480, 85 L.Ed. 800]. Thus, this Court's jurisdiction under that legislation is to be literally construed."

The desirability of strictly construing the three-judge court provision stems from the very real burden and inconvenience to the federal judicial system imposed by this requirement which drains trial court resources and affords parties direct access to the Supreme Court for review. See Allen v. State Board of Elections, 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969); Phillips v. United States, 312 U.S. 246, 61 S.Ct. 480, 85 L.Ed. 800 (1941). See also Ammerman, Three-Judge Courts: See How They Run!, 52 F.R.D. 293 (1971); Currie, The Three-Judge District Court in Constitutional Litigation, 32 U.Chi. L.Rev. 1 (1964).

of the passport statute itself or whether it attacks the constitutionality of merely administrative action permitted or required by that statute. It is clear that in the former instance the three-judge court need be formed.[5]

In the instant litigation, plaintiffs have not alleged that an Act of Congress is unconstitutional nor have they sought to enjoin a statute's enforcement. Plaintiffs' success in this action would have no effect upon the statutory framework underpinning the operations of the Passport Office. The plaintiffs' attack is on the administrative action requiring the Oath, but not on the statute.[6]

Merely finding that the instant complaint challenges administrative action rather than the statutory provision does not end this Court's inquiry.

Acts of Congress are almost never self-enforcing. They require administrative or executive action to implement their provisions. Nevertheless, different Acts of Congress require differing degrees of administrative initiative to carry out the Congressional purpose. Perfunctory administrative or executive action is all that is necessary to implement direct and specific legislative commands. More general legislation permits administrators to use their own judgment and initiative to formulate agency policy in areas never specifically addressed by Congress.

When a complaint seeks to enjoin on constitutional grounds administrative action which is merely a perfunctory execution of a specific legislative directive, that complaint actually mounts a challenge to the legislative directive. This challenge requires the convening of a three-judge court pursuant to 28 U.S.C. § 2282. However, when the complaint attacks administrative action which is permitted but not required by broad legislative policy and which resulted from the exercise of administrative judgment and initiative, that complaint attacks the administrative action itself. This attack does not require that a three-judge court be convened.[7]

Applying this test to the case at bar, this Court agrees with both parties that a three-judge court need not be convened. Plaintiffs have simply claimed

---

5. Most of the Supreme Court cases which draw this distinction as to when a three-judge court need be convened have focused on 28 U.S.C. § 2281 or its predecessor, the companion to Section 2282 involved herein. Section 2281 requires the formation of a three-judge court to protect a *state's* legislative policy from "improvident state-wide doom by a federal court." Phillips v. United States, 312 U.S. 245, 251, 61 S.Ct. 480, 483, 85 L.Ed. 800 (1941). *See* Ex parte Morgenthau, 307 U.S. 171, 173–174, 59 S.Ct. 804, 83 L.Ed. 1189 (1939).

6. *Compare* Stewart v. Washington, 301 F.Supp. 610 (D.D.C.1969) (three-judge court required because statute expressly mandated the Oath and thus an attack on the Oath was of necessity an attack on the statute).

7. *See, e. g.,* Oestereich v. Selective Service System, 280 F.Supp. 78, 81 (D. Wyo.), aff'd, 390 F.2d 100 (10th Cir.), rev'd and remanded on other grounds, 393 U.S. 233, 89 S.Ct. 414, 21 L.Ed.2d 402 (1968); Sardino v. Federal Reserve Bank of New York, 361 F.2d 106, 114–115 (2d Cir. 1966); Greene v. Kennedy, 309 F.Supp. 1127, 1132 (D.D.C. 1970) (three-judge court), app. dism'd sub nom. Coit v. Greene, 400 U.S. 986, 91 S.Ct. 460, 27 L.Ed.2d 435 (1968). *See also* National Student Ass'n v. Hershey 134 U.S.App.D.C. 56, 77 n. 56, 412 F.2d 1103, 1124 n. 56 (1969).

Flast v. Cohen, 392 U.S. 83 (1968); Zemel v. Rusk, 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965) and McGlotten v. Connally, 338 F.Supp. 448 (D. D.C.1972) (three-judge court) are not to the contrary. The instant case involves only the most general grant of authority which resulted in a policy determined by the exercise of administrative and not legislative judgment. In the three listed cases, however, the plaintiffs' complaint much more directly questioned the constitutionality of the legislative provisions. Also the primary thrust of these cases is that three-judge courts may properly deal with combined constitutional and non-constitutional challenges, a position undisputed by the parties to this litigation.

that the Oath requirement, which has only been announced through internal instructions to the local Passport Offices and not set forth in formal regulations, violates their constitutional rights. Their attack is limited to a narrow administrative judgment which under no circumstances can be said to have been directed or required by Congress when it established the statutory framework for the operation of the Passport Office. This challenge is not an attack upon the "enforcement, operation or execution of any *Act of Congress*" within the meaning of Section 2282 as defined above, and thus this Court has jurisdiction to make a determination on the merits of this action.

### Whether This Is A Proper Class Action

Five individual plaintiffs are before this Court. Plaintiffs Woodward and Fletcher have applied for passports and the defendants have rejected their applications solely as a result of their failure to execute the Oath of Allegiance. As to these two plaintiffs, all parties agree that the rejection of their applications on this ground presents the Court with a justiciable controvery. The remaining individual plaintiffs, Hoffman, Meuer and Waggoner, have not yet applied for passports, but have affirmed their intention to so apply and to refuse to execute the required Oath. As to these plaintiffs, the defendants contend that the mere expression of a desire to apply for a passport is insufficient to create a justiciable issue as to the constitutionality of the Oath of Allegiance, there being no case or controversy ripe for adjudication. In response, the plaintiffs note that the defendants have stated unequivocally that execution of the Oath is a prerequisite to issuance of a passport, and that plaintiffs raise "narrow and clearly defined" legal questions of the "authority for and constitutionality on its face of a simple and specific policy," which legal issues will not be improved by a "delay in adjudication." National Student Association v. Hershey, 134 U.S.App.D.C. 56, 72, 412 F.2d 1103, 1119 (1969).[8]

In view of its subsequent decision that this action is properly brought as a class action, however, the Court need not reach the issue of whether there is currently a justiciable controversy with respect to those of the named plaintiffs who have not yet formally applied for passports. Since, as the Court discusses below, this is a proper class action, and plaintiffs Woodward and Fletcher are properly before the Court and are adequate representatives of the class of United States citizens who have been or will be effected by the passport Oath requirement, the Court would proceed to the issues raised on behalf of the class even if defendants provided the named plaintiffs the relief sought and thus rendered the case moot as to them. *See* Jenkins v. United Gas Corp., 400 F.2d 28 (5th Cir. 1968); Torres v. New York State Department of Labor, 318 F.Supp. 1313 (S.D.N.Y.1970).

█ Unquestionably, this is a proper class action within the meaning of Rule 23(b) (2).[9] In view of the num-

8. Plaintiffs also aptly note that in the recent case of Cohen v. Rogers, Civil Action No. 3021–70, another Judge of this Court ruled, over objections by these same defendants, that plaintiffs who had not yet applied but intended to apply for passports had standing to bring a challenge which was then ripe to the Secretary of State's passport regulations. That case would appear to be, for these purposes, indistinguishable from the case at bar. *See also* note 15, *infra*, and accompanying text. *But see* Davis v. Ichord, 143 U.S.App.D.C.

183, 442 F.2d 1207 (1970). As the Secretary points out, though, if it were determined that these three plaintiffs who have not yet applied for passports were ineligible for passports for reasons other than their refusal to subscribe to the Oath the constitutional issue presented here would be avoided as to them, as it should be where possible. United States v. Rumley, 345 U.S. 41, 48, 73 S.Ct. 543, 97 L.Ed. 770 (1953).

9. Rule 23(b) provides: "An action may be maintained as a class action if the

ber of passport applicants each year, the number of persons who have been, or will be affected by the passport Oath requirement is far in excess of the number which may practicably be joined in this action. The questions of law pertaining to the lawfulness of the inclusion of the Oath requirement as a prerequisite to an issuance of a United States passport are common to all members of the class. The claims raised by plaintiff and the defenses—insofar as they go to the merits of the lawfulness of the inclusion of the Oath requirement—are typical of the claims and defenses of the class as a whole. The representative parties will fairly and adequately represent the interests of the class. The defendants, by refusing to issue passports on the ground of the failure of plaintiffs to swear to or affirm the Oath and by reiterating their policy to make execution of the Oath a prerequisite to issuance of a passport to anyone, have clearly "acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." [10]

Therefore, this Court concludes that this action may properly be maintained

---

prerequisites of subdivision (a) are satisfied, and in addition: . . . (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole . . . ." The requirements of subdivision (a) are: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law and fact common to the class; (3) the claims or defenses of the representative parties are typical of those of the class; and (4) the parties will fairly and adequately protect the interests of the class. Fed. R.Civ.P. 23.

Section (b) (2) class actions concern "the general application to the class of the alleged action or inaction of the party opposing the class. And there is action or inaction within the meaning of a rule even though it is directed to only one or a few members of the class so long as it is based on grounds which have general application to the class." 3B Moore's Federal Practice para. 23.40. See Jenkins v. United Gas Corp., 400 F.2d 28 (5th Cir. 1968); Gilmore v. James, 274 F.Supp. 75, 86 (N.D.Tex. 1967, aff'd 389 U.S. 572, 88 S.Ct. 695, 19 L.Ed.2d 783 (1968); Saint Augustine High School v. Louisiana High School Athletic Assn., 270 F.Supp. 767, 774 (E.D.La.1967), aff'd, 396 F.2d 224 (5th Cir. 1968). See also Graniteville Co. v. Equal Employ. Op. Comm., 438 F.2d 32 (4th Cir. 1971); Norwalk CORE v. Norwalk Redevelopment Agency, 395 F.2d 920 (2d Cir. 1968). Such class actions are limited to cases where final injunctive or corresponding declaratory relief on behalf of the class as a whole is appropriate. The injunctive or declaratory relief referred to does not require that the Court look into the particular circumstances of each member of the class. See Moore's Federal Practice, supra.

10. Although Rule 23 only requires notice to prospective class members in actions brought under Rule 23(b) (3), and not under Rule 23(b) (2) as is the case at bar, the Rules do permit the Court to require that notice be sent in all types of class suits to protect class members or otherwise to assure fair conduct of the action. See Fed.R.Civ.P. 23(d) (2). See also Arey v. Providence Hospital, 55 F.R.D. 62 (D.D.C.1972). In fact, one Court has held that notice is required in all representative actions as a matter of due process. Eisen v. Carlisle & Jacquelin, 391 F.2d 555, 564 (2d Cir. 1968). See Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950).

In the particular circumstances of this case, however, where the adequacy of the representation of the class interests by the named parties is clear, where no apparent purpose would be served by notice to this wide-ranging class even if notice were at all practicable, and where, indeed, judgment is in favor of the class, the essential requisites of due process have been met without further notice. See, e. g., Northern Natural Gas Co. v. Grounds, 292 F.Supp. 619, 636 (D.Kan.1968) ("the essential requisite of due process as to absent members of the class is not notice, but the adequacy of representation of their interests by named parties"); Snyder v. Board of Trustees, 286 F.Supp. 927, 931 (N.D.Ill.1968); 3B Moore's Federal Practice para. 23.55.

as a class action, and now turns to the merits of this dispute.

## HISTORY OF THE PASSPORT OATH REQUIREMENT

From 1861 to 1966, the Department of State required execution of an Oath of Allegiance as a prerequisite to the issuance of a passport. In the version of the Passport Regulations in effect until 1966, each citizen's application for a passport was required to contain "[t]he applicant's oath or affirmation of allegiance to the United States." [11] However, it was not until 1952,[12] that the possession of a valid passport, though always a great convenience in foreign travel, was generally made a legal requirement for leaving or entering the United States.[13] That legal requirement prevails today, except for travel to certain designated countries.[14]

In 1966, the Department of State voluntarily eliminated the requirement that an applicant swear to or affirm the contents of the Oath. In an Airgram sent to all United States diplomatic and consular posts on December 27, 1966, over the signature of then Secretary of State Rusk, as well as in instructions dispatched to all passport agents by Defendant Knight on March 24, 1969, it was stated: "The Department has no legal authority to deny a passport to a U. S. citizen who refuses to take the Oath of Allegiance." Therefore, while the Oath still was included in the passport application form, the post-1966 reg-

ulations permitted it to be deleted at the option of the passport applicant.

This optional Oath regimen prevailed from 1966 to July 28, 1971, when Judge Green of this Court ruled in Cohen et al. v. Rogers et al., Civil Action No. 3021–70, that "the inclusion of an optional Oath of Allegiance on the standard application form for a United States passport unfairly discriminates among United States citizens . . . ." The Court logically went on to rule that since the optional Oath was unlawful, the defendants would have to either delete the Oath requirement entirely or require the Oath of all applicants for a United States passport.[15]

On November 1, 1971, the defendants issued instructions to their employees that henceforth the Oath would be a mandatory requirement for the issuance of a United States passport, but that various alternative Oaths were permissible.[16] It is this decision by the defendants that is under attack by the plaintiffs herein.

## STATUTORY CONSIDERATIONS

The current provisions with respect to the issuance of passports are grouped in 22 U.S.C. §§ 211a, 212 and 213. It is the position of the Secretary of State that these statutory sections, when read collectively, grant authority for the defendants' actions, but that even if no explicit authority can be found in these statutes, congressional silence has ratified the Secretary's practice of requir-

---

11. See 22 C.F.R. 51.23(O) (Jan. 1, 1966). The Oath required was that set out in the text at note 2, supra.

12. See 8 U.S.C. § 1185; 22 C.F.R. Part 53.

13. See Kent v. Dulles, 357 U.S. 116, 121–78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958).

14. See note 12, supra.

15. It should be noted that in ruling that the requirement of an Oath is unlawful, this Court in no way impeaches the validity of Judge Green's earlier ruling in the Cohen case that an optional Oath was also unlawful. In Cohen, having struck down the optional Oath, the Court gave

the defendants the logical alternatives of either making the Oath mandatory or deleting it altogether. The only issue before the Court in Cohen was the permissibility of the optional Oath. The issue of the lawfulness of the mandatory Oath was not presented to the Cohen court, nor was it effectively briefed or argued. Now that this issue is presented to this Court, and is thoroughly briefed as well as argued, this Court rules, as indicated below, that the mandatory requirement of an Oath is also unlawful.

16. See note 2, supra, and accompanying text.

ing subscription to an Oath of Allegiance as a pre-condition to the receipt of a United States passport.

In weighing these contentions, this Court is mindful of the caveat issued by the United States Court of Appeals for the District of Columbia Circuit that where a citizen's Fifth Amendment right to travel is at issue, as it is here,[17] "statutory limitations [of this right] will be strictly construed." Lynd v. Rusk, 128 U.S.App.D.C. 399, 404, 389 F.2d 940, 945 (1967). "Where activities of enjoyment, natural and often necessary to the well-being of an American citizen, such as travel, are involved, we will construe narrowly all delegated powers that curtail or dilute them." Kent v. Dulles, 357 U.S. 116, 129, 78 S.Ct. 1113, 1120 (1958).[18]

Section 213 of Title 22 of the United States Court provides the statutory authority for the Department of State to condition the granting of passports upon submission of a proper application form. It is the only statutory provision which explicitly regulates the application itself, and thus would be the natural repository of statutory authority for the defendants' denial of a passport to an applicant solely on the basis of the application. Section 213 states in pertinent part that an applicant

"shall subscribe to and submit a written application . . . [which] shall contain a true recital of each and every *matter of fact which may be required by law or by any rules authorized by law* to be stated as a prerequisite to the issuance of any such passport." (Emphasis added.)

Under no reasonable reading can this section, standing alone, be construed as authorizing inclusion of the Oath of Allegiance on the passport application form. It permits inclusion only of a recital of a "matter of fact which may be required by law or by any rules authorized by law." The Oath of Allegiance is clearly not a matter of "fact", and the defendants' apparently concede as much.[19]

Even if the Oath was deemed to concern matters of "fact", it still would not be authorized by Section 213 since the Oath is not a matter "required by law or

---

17. *See* text accompanying notes 35–37.

18. Legislation which authorizes action encroaching on constitutional rights must be construed in the manner which affords the greatest protection for individual rights since it must be assumed "that the law makers intended to place no greater restraint on the citizen than was clearly and unmistakenly indicated by the language they used." Ex parte Endo, 323 U.S. 283, 300, 65 S.Ct. 208, 217, 89 L.Ed. 243 (1944). *See* Greene v. McElroy, 360 U.S. 474, 507, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959); Social Security Board v. Nierotko, 327 U.S. 358, 369, 66 S.Ct. 55, 90 L.Ed. 412 (1946). It is true, though, that "[t]he interpretation expressly placed on a statute by those charged with its administration must be given weight by courts faced with the task of construing the statute" and that under "some circumstances, Congress' failure to repeal or revise in the face of [an] administrative interpretation has been held to constitute persuasive evidence that the interpretation is the one intended by Congress." Zemel v. Rusk, 381 U.S. 1, 11, 85 S.Ct. 1271, 1278 (1965). In this connection, see note 34, *infra*.

19. While the legislative history of 22 U.S.C. § 213 provides little guidance as to meaning of the word "fact", it can be assumed that Congress used the word in accordance with its generally accepted meaning. Webster's defines "fact" as "an actual happening in time or space" or "an assertion, a statement information containing, or purporting to contain, something having a objective reality." Webster's Third New International Dictionary, Merriam (1964). Wigmore views a "fact" as a "concrete occurrence". Wigmore, Evidence § 1 (3d ed. 1940). Certainly a belief is not ordinarily considered to be a "fact", Sovereign Pocohontas Co. v. Bond, 74 U.S. App.D.C. 175, 176, 120 F.2d 39, 40 (1941), and neither is this Oath, cast as an *in futuro* promise and totally devoid of mention of past events or concrete occurrences. In referring to matters of "fact", it seems clear that Congress was concerned with matters such as the date or place of birth of the applicant and not with promises evidencing a state of mind or belief.

by any rules authorized by law . . . ." While it is true that prior to October, 1966, federal regulations and rules did make the Oath a prerequisite to the receipt of a United States passport,[20] that requirement was eliminated in October of 1966 when the State Department issued new regulations governing the application process. These new regulations make no mention of an Oath of Allegiance. To date, defendants have issued no rules or regulations reimposing the Oath requirement.[21] Consequently, this Oath may not be deemed a matter "required by law or by any rules authorized by law . . ." under Section 213.

■ Similarly, no authorization for the defendants' actions can be found in 22 U.S.C. § 211a. That section provides:

"The Secretary of State may grant and issue passports . . . under such rules as the President shall designate and prescribe . . . and no other person shall grant, issue or verify such passports."

The President by Executive Order No. 11295 of August 5, 1966, empowered the Secretary of State "to designate and prescribe for and on behalf of the United States rules *governing the granting, issuing, and verifying* of passports." On its face, it is undisputed that this language only provides authority to promulgate procedural rules governing the operations of the Passport Office, and not a grant of undefined substantive powers. In addition, as indicated above, defendants have not prescribed any current rules or regulations establishing the swearing or affirming of the Oath as a prerequisite for granting of a United States passport. Although it is true that the defendants did notify their employees of their decision in late November, 1971, to make the Oath a mandatory requirement, it can hardly be argued that an Airgram sent to diplomatic and consular posts informing them of this decision, as well as a teletype message to passport agencies and excerpts from the Handbook on Passports[22] constitute "rules" and rule-making within the meaning of Section 211a (or Section 213 discussed above). The Administrative Procedure Act[23] defines a "rule"[24] as encompassing the very type of administrative pronouncement anticipated by Sections 211a and 213. The specific procedure prescribed by the A.P.A. and applicable to sections 211a and 213, including publication for public scrutiny in the Federal Register, cannot be satisfied by internal bulletins to State Department employees. *Cf.* United States v. Morton Salt Co., 338 U.S. 632, 644, 70 S.Ct. 357, 94 L.Ed. 401 (1950).

Therefore, Section 211a also fails to provide explicit statutory authorization for the imposition by the defendants of the mandatory Oath of Allegiance as a condition precedent to obtaining a valid United States passport.

■ Nor does Section 212 of Title 22 provide the legislative authority the defendants seek for imposing the Oath requirement. Section 212 states:

"No passport shall be granted or issued to or verified for any other persons than *those owing allegiance, whether citizens or not, to the United States.*" (Emphasis added.)

The defendants argue that this statutory limitation of their power to issue passports only to persons "owing allegiance" to the United States supports their decision to require an Oath of Allegiance from all passport applicants.

This Court disagrees. As is demonstrated below, in employing the phrase

---

20. See note 11, *supra*, and accompanying text.

21. For a discussion of the apparent requirement that any such "rules" be issued pursuant to the terms of the Administrative Procedure Act, see note 23, *infra*, and accompanying text.

22. *See* note 2, *supra*, and accompanying text.

23. Administrative Procedure Act, 5 U.S.C. §§ 551–59.

24. *See* 5 U.S.C. § 551(4).

"owing allegiance", Congress never intended that an Oath requirement be imposed upon applicants.

This statute was not always the law. In the first passport legislation enacted in 1866, 14 Stat. 54, a predecessor to 22 U.S.C. § 212, Congress commanded only that

"And hereafter passports shall be issued *only to citizens of the United States.*" (Emphasis added.)

On January 4, 1902, Secretary of State John Hay requested the deletion of the last five words of the 1866 Act and the substitution of the present language of 22 U.S.C. § 212. Thus, the Secretary urged Congress to permit passports to be issued not just for *"citizens* of the United States", but for all "persons . . . *owing allegiance, whether citizens or not,* to the United States." Why did the Secretary urge this broadening of the authority to issue passports? The Secretary addressed that very issue in his letter of January 4, 1902, to the Honorable R. R. Hitt, Chairman of the Committee on Foreign Affairs. After noting in his letter that the Department of State had not issued passports to residents of the recently acquired territories of the Philippines, Puerto Rico and Guam, the Secretary stated:

"The purpose of this amendment to existing legislation herewith submitted is to secure the sanction of law to the granting of passports to residents of our insular possessions, and thus enable this Government to extend to them a full measure of protection abroad." H.Rep.No.599, 57th Cong., 1st Sess. (1902).

In fact, the legislation urged by Secretary Hays was enacted in what is now 22 U.S.C. § 212. Any doubt that the sole purpose of the 1902 amendment

adding the "persons owing allegiance" phrase was to achieve the Secretary's stated goal of expanding his authority to issue passports, is resolved by the legislative history of this amendment.[25]

Thus, it is clear that this 1902 amendment, passed solely to expand the State Department's authority to issue passports even to non-citizens, cannot "have [the] effect" of additionally giving "a legislative basis for the administrative practice of requiring passport applicants to subscribe to an Oath of Allegiance . . . ."[26] The phrase—"persons . . . owing allegiance, whether citizens or not," calls for a logical determination of whether the applicant, even if not a citizen, is nonetheless subject to the territorial jurisdiction of the United States. The statutory test is whether one "owes" allegiance—that is, whether he is regarded by law as "owing" allegiance to the United States by virtue of his territorial residence and status. The statutory test is not whether one "gives" or promises his allegiance to the United States.

This view of the clear and unequivocal impact of Section 212 was not only shared by then Secretary Hays and the 1902 Congress, but by the then United States Attorney General as well. In 1907, the Attorney General decided that citizens of Panama who were residents of the Canal Zone at the time of the treaty between the United States and Panama and who had not taken steps to retain citizenship in the Republic of Panama *owed allegiance* to the United States and were thus entitled to United States passports. 26 Op.Atty.Gen. 376 (1907).

In short, none of the statutory provisions relied upon by the defendants provide explicit authority for their decision to impose a mandatory Oath of Alle-

---

25. *See* H.Rep.No.559, 57th Cong., 1st Sess. (1902). This House Report, after quoting the letter of Secretary Hays, stated: "The reasons for the necessity of the passage of this bill are so fully set forth in the letter from the Secretary of State that your committee does not

deem it necessary to make further suggestions." *Id.*

26. Defendants' memorandum of points and authorities in the instant case, filed April 7, 1972, at p. 6.

giance prerequisite to the issuance of a passport to a United States citizen.[27]

Lacking explicit statutory authority, the defendants nevertheless contend that the simple fact that Congress has re-enacted the passport legislation without prohibiting the longstanding Oath requirement implicitly gives legislative sanction to their actions.

■■■■ While an Oath of Allegiance may, indeed, have been included on the passport application for an extended period, travel abroad until recently was not conditioned upon the possession of a passport, with the exception of limited periods of international hostilities or national emergency.[28] Moreover, there has been no evidence introduced establishing an open and highly published practice of denying applicants passports for simply refusing to swear to or affirm the Oath. Under these circumstances, this Court is extremely reluctant to conclude that Congress, in re-enacting the passport legislation in 1952, indicated a clear intention to authorize the Secretary of State to establish the Oath requirement as a prerequisite to the exercise of a citizen's constitutionally protected right to travel.[29] Indeed, the Supreme Court has made it plain that only the clearest of such evidence will permit this Court to consider Congressional silence to be a substitute for explicit and affirmative legislative action in limiting the free exercise of important rights. *See, e. g.*, Greene v. McElroy, 360 U.S. 474, 79 S. Ct. 1400, 3 L.Ed.2d 1377 (1959); Kent v. Dulles, 357 U.S. 116, 129, 78 S.Ct. 1113 (1958); Ex parte Endo, 323 U.S.

283, 300, 65 S.Ct. 208, 89 L.Ed. 243 (1944).

Defendants urge this Court to survey past administrative practices in order to determine whether the Oath requirement was implicitly authorized by Congressional re-enactments in 1952. However, this action is unneeded for the Supreme Court itself has authoritatively undertaken that very task, and concluded that there were only two categories of passport refusals implicitly adopted by Congress in 1952. Of these two categories, one dealt with questions of allegiance: [30]

"First, questions pertinent to the citizenship of the applicant and his allegiance to the United States had to be resolved by the Secretary, for the command of Congress was that 'No passport shall be granted or issued to or verified for any other persons than those owing allegiance, whether citizens or not, to the United States.' 32 Stat. 386, 322 U.S.C. § 212." Kent v. Dulles, *supra*, 357 U.S. at 127, 78 S.Ct. at 1119.

The theory of allegiance referred to by the Court thus clearly embodies the same territorial or juridical concepts set forth in 22 U.S.C. § 212,[31] and cannot be construed as encompassing an Oath which "promises" allegiance.

Finally, although Section 211a has on one occasion been read by a majority of the Supreme Court as implicitly embodying a grant of authority [32] to the Executive to do other than formulate procedural rules, Zemel v. Rusk, 381 U.S. 1, 7, 85 S.Ct. 1271, 14 L.Ed.2d 178 (1965), that decision was reached only after an

---

27. Defendants also maintain that, even though none of the statutory provisions may itself provide authority for the Oath requirement, these sections, when read collectively, provide such authority. Defendants have neither elaborated upon this argument nor provided any authority for their contention, and the Court knows of no such authority. Thus, this Court concludes that, in the absence of authority specifically granted by one of these sections, no additional support for defendants' actions is gained by reading them together.

28. *See* Kent v. Dulles, 357 U.S. 116, 121–123, 78 S.Ct. 1113 (1958). *See also* notes 11–14, *supra*, and accompanying text.

29. The Constitutional dimensions of this case are discussed at notes 35–44, *infra*, and accompanying text.

30. The other concerned the applicant's criminal or unlawful conduct.

31. *See* Discussion of Section 212 at note 25, *supra*, and accompanying text.

32. The explicit authority granted by Section 211a has already been discussed in the text following note 21, *supra*.

exhaustive review of State Department precedents, detailed and specific Executive Orders and subsequent legislation convinced the Court that Congress had delegated the authority to refuse to validate passports of United States citizens for travel to Cuba.[33] No such evidence exists with respect to the Oath of Allegiance, and, in fact, the instant case is controlled in this respect by Kent v. Dulles, 357 U.S. 116, 78 S.Ct. 1131 (1958), where the Court was "unable to find, with regard to the sort of passport refusal involved there, an administrative practice sufficiently substantial and consistent to warrant the conclusion that Congress had implicitly approved it." Zemel v. Rusk, 381 U.S. 1, 12, 85 S.Ct. 1271, 1279 (1965).[34]

In sum, there is neither explicit nor implicit statutory authority for the actions of the defendants in making the requirement of an Oath of Allegiance a prerequisite to the issuance of a passport.

## CONSTITUTIONAL CONSIDERATIONS

Ordinarily, the determination by this Court that there is neither explicit nor implicit authority for the defendants' actions, when coupled with the requirement previously postulated that at least some legislative authorization would be needed to sustain their actions in this case [35] would be a sufficient basis for granting to plaintiffs their requested relief.

However, this Court is not unmindful of the note sounded by the Court of Appeals in Lynd v. Rusk, another difficult passport case, when it observed that "[g]leaning intention from Congressional silence is under the best of circumstances an elusive task." 128 U.S.App. D.C. 399, 404, 389 F.2d 940, 946 (1967).

Therefore, the Court will also consider the merits of plaintiffs' added contention that the defendants' conduct, even if legislatively authorized, unconstitutionally infringes upon protected rights to travel abroad.

The right to travel outside of the United States is a liberty guaranteed by the Fifth Amendment. Aptheker v. Secretary of State, 378 U.S. 500, 505, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964); Kent v. Dulles, 357 U.S. 116, 125–126, 78 S.Ct. 1113 (1958). "Freedom of movement across frontiers in either direction, and inside frontiers as well, was a part of our heritage. . . . Freedom of movement is basic in our scheme of values." Kent v. Dulles, supra at 126, 78 S.Ct. at 1118.

Since, with few exceptions, it is unlawful to leave or enter the United States without a valid passport, refusal to issue a passport constitutes a direct abridgement of this right to travel. Refusal to issue a passport can also result in a serious impairment to the livelihood of persons, such as plaintiff Fletcher, whose occupations require travel.[36]

In considering the constitutionality of this abridgement, the Supreme Court has made it clear that although the right to travel is a Fifth Amend-

---

33. The decision in *Zemel* was also reached over the vigorous dissent of Mr. Justice Goldberg who argued that this Section 211a was designed "solely to centralize authority to issue passports in the hands of the Secretary of State in order to overcome the abuses and chaos caused by the fact that prior to the passage of the statute numerous unauthorized persons issued passports and travel documents." Zemel v. Rusk, 381 U.S. at 30, 85 S.Ct. at 1288 (Goldberg, J., dissenting).

34. *Zemel* also differs from the case at bar because here the only issue is defendants' authority to deny passports solely on the basis of the application. This case,

unlike *Zemel*, does not present the question of whether defendants' have been given en powers to refuse to validate a passport for travel to a particular country. *Zemel* concerned only specific narrowly drawn restrictions on travel to designated countries. It, unlike Kent v. Dulles, and this case as well, did not deal with denials of passports which precluded almost all foreign travel.

35. *See* note 18, *supra*, and accompanying text.

36. *See* note 1, *supra*, and accompanying text.

ment "liberty", the fact that "a liberty cannot be inhibited without due process of law does not mean that it can under no circumstances be inhibited." Zemel v. Rusk, 381 U.S. 1, 14, 85 S.Ct. 1271, 1279, (1965) and authorities cited therein.[37]

It is equally clear, however, that where restrictions on the right to international travel have been upheld, their lawfulness has been considered a "function not only of the *extent* of the governmental restrictions imposed, but also of the extent of the *necessity* for the restriction." Zemel v. Rusk, *supra* (emphasis added).

Like the Supreme Court in Aptheker v. Secretary of State, 378 U.S. 500, 84 S.Ct. 1659 (1964), this Court is confronted with restrictions on freedom of movement across borders whose extent and substantiality "cannot be doubted. The denial of a passport, given existing domestic and foreign laws, is a severe restriction upon, and in effect a prohibition against, world-wide foreign travel." Aptheker v. Secretary of State, *supra*, at 507, 84 S.Ct. at 1664.

What, then, is the necessity for the government's action in erecting this substantial barrier to world travel for Americans who refused to swear allegiance?

The Secretary of State argues that the Oath of Allegiance serves to inform an American national of his primary allegiance to the United States, and reinforces his awareness of his legal obligation to resist any pressures by foreign governments to cause him to act contrary to this primary allegiance under the concept of "temporary allegiance".[38]

The defendants assert:

"Since the host sovereign may attempt to under the concept of 'temporary allegiance' to [sic] cause the American national to act in some fashion inconsistent with his primary allegiance to the United States, no more appropriate manner can be imagined to inform the American of his legal obligation to resist any such attempts than to require him to swear or affirm his allegiance to his country, for an individual is far more likely to be impressed with his duty of allegiance if he has taken an oath that he 'will support and defend the Constitution of the United States against all enemies, foreign and domestic' and that he 'will bear true faith and allegiance to the same,' than he would if the legal requirement of allegiance were merely stated on the passport application as a cautionary warning. Since the oath requirement contributes to his awareness and understanding of the duty of allegiance and its importance, both to himself and his country, the oath serves a proper and important public interest."

The defendants conclude:

"The requirement that a passport applicant subscribe to an Oath of Allegiance as a condition prerequisite to the issuance of a passport not only accommodates the proper ends of government but is of great value to the applicant as well, and as such it is a reasonable regulation under law." [39]

---

37. For the statutory implications of Zemel v. Rusk, *supra*, see notes 33, 34, *infra*, and accompanying text.

38. By "temporary allegiance", the Secretary invokes the doctrine that under international law, a citizen who journeys in a foreign country encounters situations where of necessity he is subjected to pressures on his primary allegiance to this country since "[a]ll strangers are under the protection of the sovereign while they are within his territories, and owe a temporary allegiance in return for that protection." Carlisle v. United States, 83 U.S. (16 Wall.) 147, 154, 21 L.Ed. 426 (1872). *See* Eisler v. United States, 83 U.S.App.D.C. 315, 170 F.2d 273, cert. granted, 335 U.S. 857, 69 S.Ct. 130, 93 L.Ed. 404 (1948), ordered off docket, 338 U.S. 189, 69 S.Ct. 1453, 93 L.Ed. 1897 (1949); Leonhard v. Eley, 151 F.2d 409 (10th Cir. 1945); Fletes-Mora v. Rogers, 160 F.Supp. 215, 216–219 (S.D.Cal.1958).

39. Defendants' Memorandum of Points and Authorities in the instant case, filed April 7, 1972, at pp. 18–19.

This Court disagrees. Even if it fully credits the defendants' contention, as yet factually unsupported, that the Oath and the manner in which it is executed at the nation's passport offices serve the claimed purpose of warding off the potential pitfalls of "temporary allegiance" —and, indeed, in considering plaintiffs' motion for summary judgment, it must fully credit the defendants' allegations [40] —the Court nonetheless is at a loss to understand why the Oath requirement, which defendants apparently viewed as unnecessary from 1966 to 1971,[41] is now so essential.

The Court concludes that this extensive ban on foreign travel, applicable to all who seek to visit abroad, is not reasonably justified by the government's need to inform citizens about the dangers inherent in their obligation of "temporary allegiance".

The purpose here asserted by defendants can be served by far less restrictive means.[42] For example, defendants could include on the passport application a statement apprising the applicant of his duties to the United States and requiring him to acknowledge that he had read the statement. Alternatively, the government could include such information in the passport itself, or in other forms of communication with the applicant. In any case, the intent to inform passport applicants of their legal duties to the United States in no way requires restrictions which call for the applicants to make affirmative statements in the nature of this Oath and which are backed by the sanction of the denial of the right to travel.

In addition, there is apparently no purpose other than the one offered by the defendants which could even arguably justify the Oath requirement. Since the Oath applies irrespective of the country to which the applicant intends to travel, it cannot be justified as a response to problems arising in the government's dealing with specific nations. It does not depend upon a showing of the applicant's past criminal conduct, the likelihood of his travel in pursuit of unlawful purposes, the possibility that he may engage in activities contrary to the United States' national security interests, or the applicant's ignorance or unawareness of his primary allegiance to the United States. Because the requirement serves to deny passports only to those who openly refuse to comply with the Oath requirement, it would certainly appear to be a wholly ineffective means of preventing the travel of individuals intent upon committing acts contrary to the country's foreign policy interests. Such individuals would surely be willing to affirm the Oath falsely in furtherance of their unlawful purposes. Indeed, the only result of requiring execution of the Oath as a prerequisite to foreign travel is to prohibit foreign travel by those persons who find a public affirmation of loyalty repugnant to their integrity and conscience. No serious national purpose is served by singling out those people and curtailing their Fifth Amendment right to travel.

In short, given the necessity of passports for foreign travel, the mandatory requirement that all applicants for United States passports swear to or affirm an Oath of Allegiance is an unconstitutional abridgement of the Fifth Amendment right of our citizens to travel abroad.

40. See 6 Moore's Federal Practice, ¶ 56.15 [3].

41. See note 15, supra, and accompanying text. It is also worth noting that these defendants, just prior to this lawsuit, were of the view that "[t]he [State] Department has no legal authority to deny a passport to a United States citizen applicant who refuses to take the Oath of Allegiance." See the textual discussion following note 14, supra.

42. See Aptheker v. Secretary of State, 378 U.S. 500, 507–508, 512, 84 S.Ct. 1659 (1964); NAACP v. Alabama, 377 U.S. 288, 307, 84 S.Ct. 1302, 12 L.Ed.2d 325 (1964); Shelton v. Tucker, 364 U.S. 479, 488, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960).

In addition to the Fifth Amendment right to travel, the plaintiffs argue that the Oath requirement also infringes upon the passport applicant's First Amendment rights. They view the necessity that applicants swear to or affirm the Oath as an effort by the state to delve into the applicant's thoughts and beliefs, even though the freedom to believe what one will "is absolute". Cantwell v. Connecticut, 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). Accordingly, the plaintiffs contend that the Bill of Rights, "which guards the individual's right to speak his own mind, [does not leave] it open to public authorities to compel him to utter what is not in his mind," [43] and "[w]hen a state seeks to inquire about an individual's belief and associations a heavy burden lies upon it to show that the inquiry is necessary to protect a legitimate state interest." [44]

The validity of this First Amendment challenge to the Oath has been substantially undercut but certainly not eliminated in this case [45] by the recent Supreme Court decision in Cole v. Richardson, 405 U.S. 676, 92 S.Ct. 1332, 31 L. Ed.2d 593 (1972), which upheld the loyalty oath required of employees at a state hospital.[46] In *Cole, supra,* the Court noted that

". . . [T]he purpose leading legislatures to enact such oaths, just as the purpose leading the Framers of our Constitution to include the two explicit constitutional oaths, was not to create specific responsibilities, but to assure that *those in positions of public trust* were willing to commit themselves to live by the constitutional processes of our system . . . ." Cole v. Richardson, *supra,* 405 U.S. at 684, 92 S.Ct. at 1337. (emphasis added).

However, the Court does not find it necessary to reach the plaintiffs' First Amendment challenge in this case.

## CONCLUSION

The requirement of the Secretary of State and the Director of the Passport Office that United States citizens swear to or affirm the contents of an Oath of Allegiance as a prerequisite to the issuance of a United States passport is unauthorized by law and violates rights protected by the Fifth Amendment to the United States Constitution.

Accordingly, defendants' motion for summary judgment is denied, and plaintiffs' motion for summary judgment is granted.

---

43. West Virginia State Board of Education v. Barnette, 319 U.S. 624, 634, 63 S.Ct. 1178, 1183, 87 L.Ed. 1628 (1943). *See* Stanley v. Georgia, 394 U.S. 557, 566, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969).

44. Baird v. State Bar of Arizona, 401 U.S. 1, 6–7, 91 S.Ct. 702, 706, 27 L.Ed.2d 639 (1971). *See* Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); Sherbert v. Verner, 374 U.S. 398, 403, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); Gibson v. Florida Legislative Investigation Committee, 372 U.S. 539, 546, 83 S.Ct. 889, 9 L.Ed.2d 929 (1963); Bates v. Little Rock, 361 U.S. 516, 524–525, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960).

45. The plaintiffs could certainly argue that the considerations which underlie a loyalty oath requirement for individuals holding a particular relationship to a state or federal government and charged with a responsibility of executing public functions in accord therewith, which considerations played a major role in the Court's decision in *Cole, supra,* differ substantially from those bearing upon such a loyalty oath required of *all* United States citizens who wish simply to exercise their constitutional right to travel abroad.

46. The Oath in *Cole* was as follows: "I do solemnly swear (or affirm) that I will uphold and defend the Constitution of the United States of America and the Constitution of the Commonwealth of Massachusetts and that I will oppose the overthrow of the Government of the United States of America or of this Commonwealth by force, violence, or by any illegal or unconstitutional method." Cole v. Richardson, 405 U.S. at 678, 92 S.Ct. at 1334. *See also* Biklen v. Board of Education, 406 U.S. 951, 92 S.Ct. 2060, 32 L.Ed.2d 340 (1972).